Good morning, Your Honors. May it please the Court, my name is Scott Fisher and I'm with Law Firm of Garland, Gerstein & Fisher, and I'll be speaking this morning on behalf of the objector appellants, Robert Johnson and Phyllis Landau, purchases of long-term care insurance policies issued by the defendant appellee's CNA and its wholly owned subsidiary, Continental Casualty Company. I'd like to reserve three minutes on rebuttal if I may, Your Honor. All right. Respectfully, Your Honors, we submit that the District Court committed reversible error in failing to perform its important oversight function under Rule 23E of the Federal Rules of Civil Procedure. First of all, Mr. Fisher, with respect of Landau, Landau brought a claim essentially identical to the one that she brought in this action against CNA under the Illinois Consumer Fraud Act, which was dismissed with prejudice. Why does that not constitute race judicata as to her claim and therefore we should dismiss as to her claim? A couple of reasons, Your Honor. First of all, that case was brought about a year and a half ago. It was a case that the appellate court in Illinois held that was a case that was dismissed for a lack of jurisdiction and therefore the standing issue was not determinative and therefore there was no adjudication on the merits. Whoa, whoa, whoa, whoa, whoa. Under Illinois statutory law, a dismissal for lack of jurisdiction is a dismissal on the merits and with prejudice, correct? No, Your Honor. That's not – I don't believe that's correct. Was it under Pennsylvania? Was it under the Pennsylvania statute? No, it was brought under the Illinois Consumer Fraud statute, but I don't believe that's correct, Your Honor. Let me see. A dismissal for lack of subject matter jurisdiction under Illinois law is without prejudice. That's fine. Now reply brief at pages 11 and 12. And therefore there was no adjudication on the merits of Ms. Blandau's claim for the false and misleading selling claims that she alleged in her Illinois complaint. There's a couple of other reasons that we point out that she still has standing to object to that. Illinois Supreme Court Rule 273 provides, unless the order of dismissal or statute of the state otherwise specifies an involuntary dismissal of an action, which this was, other than a dismissal for lack of jurisdiction, operates as an adjudication upon the merits. The Illinois court said that the remedy under the Illinois statute was not available to Ms. Blandau because all the acts which she claimed had been committed were committed in Pennsylvania. It wasn't a lack of jurisdiction on the subject matter. It wasn't a lack of under the Illinois statute, which caused the involuntary dismissal, I would thought. I think that the Illinois appellate court specifically said this was an adjudication. It was not a standing adjudication. It was an adjudication for lack of jurisdiction. And that did not operate as an adjudication on the merits. All right. But there are several other reasons as to why she still would have standing, even if that was the case. First of all, she has continuing standing to challenge the release, since the release of the claims in the Schaefer action is significantly broader than the claims that she brought in Illinois, in her Illinois case. And she has a continuing interest in seeing that there are no further increases in her policy premiums. She understood when she purchased a policy based upon the selling materials that are now part of the record before this court that her premiums would be fixed if she acted early. And she still believes that that was the case. So she's been hit with one 50 percent increase. She still has a continuing interest in trying to prevent a second continuing interest. And if this settlement is approved, it would release, it would attempt to release her ability to file the second claim to prevent further increases in her premiums on her policy. Your Honor, again, we failed, we believe the lower court failed to analyze independently whether this proposed broad class action settlement, providing no cash to any class members, it approved without opinion or findings was fair, reasonable, and adequate to absent class members. We submit that failure is particularly egregious here because there were so many articulated procedural and substantive challenges to the settlement, repeatedly and emphatically that were raised before the district court. They were raised in pleadings that were filed before the district court. They were raised in over 120 letter objections. And they were raised finally at oral argument at the settlement hearing itself. Under the federal rules, the district court serves a very important function to protect absent class members in the framework of class action practice and procedure. And that's particularly important at the time of settlement because at the time of settlement, once adversarial parties who might have been at each other's throats during the course of the litigation are now joined at the hip trying to seek final approval of the settlement. And that's particularly true here where there were so many last-minute goodies that were thrown in for the corporate defendants, an 11th-hour broadening of the class from a California class to a national class. Well, that was a deal-breaker. They wouldn't settle unless you had a national class. You can understand that. Absolutely, Your Honor. But the court has some responsibility to take a look at that a little more carefully than it did here, particularly when it's raised to the court as being a problem with the settlement, that there are differences, there may have been differences under state law, particularly with respect to the claims that were alleged in this case, claims alleged here, the false and misleading selling material claims. Under Illinois, Pennsylvania, and New York law, I know that where the insurance contract may vary from the terms of the promotional materials, many courts find that liability would lie for false and misleading representations. That's exactly what happened here. The policies at the inception, policyholders were presented with all these great stories about how this if you act early and you buy this policy now, your policy premiums would be locked in. And the insurance company sends out the policy contract a month or two after you actually sign up for it. And in the fine print it says something about premiums are not guaranteed. But many courts in many states around the country find that where promotional materials are at odds with the contract itself, you can have liability. The court never made any kind of an offer. I have the impression that rather than fine print, the ability to change premiums was in caps at the beginning of the contract. I didn't look at every single policy, Your Honor, so that's possible. You didn't look at every one, then where did you get the fine print? I'm sorry, Your Honor. It's bigger speech. It may have been. We submit by simply endorsing the settling party's proposed amended final judgment without opinion or analysis, there is no discernible way how the district court considered, if at all, the many well-supported structural defects to this settlement that we highlighted in the objections and that were presented to the district court, and again in our memorandum on this appeal. Instead of independent analysis, which in accordance with the manual for complex litigation should be exacting and thorough, the district court simply executed the verbatim proposed forms of order submitted by the parties. Contrary to the advisory notes, the Rule 23 suggesting that a district court make findings that support the conclusion that a settlement is fair, reasonable, and adequate. Class members and this court on this appeal are left to scratch their heads and to guess at how, if at all, the court considered and reconciled the fact that by certifying a national class at the last minute, it created a sharp intra-class conflict. Those policyholders, like those in California, that had received a 50 percent increase, and those policyholders in states where there had been no increase, yet a single counsel negotiating for those sharply different classes. There's no discussion by the district court of that. There was no discussion by the district court as to whether it considered that Plaintiff's counsel here, with their low-ball premium theory, that is that policyholders paid too little for their policies, how that may have compromised and disarmed Plaintiff's counsel from negotiating hard and vigorously by pressing for a more favorable resolution. By asserting a weak claim, CNA basically said, we're not paying any cash because policyholders benefited from those low-ball premiums. There's no analysis by the district court of that. There was no analysis by the district court of the release that was granted here. It was a broad release reducing claims that went beyond. What you're saying is there was no written analysis in Judge Gutierrez's opinion. All he did was a one-page opinion. So, but that doesn't mean that he didn't analyze at the preliminary hearing and at the fairness hearing, and both of those had hearings and discussions. And as I remember it, the policyholders who claimed that they had been defrauded or They could either continue to pay their premiums at a higher rate and get a certain amount of long-term coverage. They could stop paying but still continue to get long-term coverage to a certain amount. They could opt for some qualified tax options. They were given two or three options that they could opt for. Some of, all of which gave benefits to the policyholders as opposed to what might very well take place at trial, which was that the jury or the judge, if that were the case, would say, it said in black letters at the beginning of your policy that premiums could be raised. Why are you bringing a lawsuit in the first place? Could have gotten what we used to call a horse collar, right? So they did get some benefits. The difference is the attorneys got $5 million in cash. The policyholders got a menu of different choices as opposed to perhaps a defense verdict, right? So why weren't the menu of choices within the reasonable value of what their claims are worth as far as the trial court was concerned? Well, that may have been the case, but we don't know because the judge never analyzed the benefits either. However, we do know- See, he didn't analyze it because he didn't state it in writing. But he was there, he heard the arguments, he had memoranda prepared as to the different proposals. He read them, he discussed them with the counsel, he had them explained to him. What you're saying is that he wasn't writing his analysis, not that he wasn't making it between his ears, right? I'm saying, Your Honor, when the parties conceded that 97% of the policyholders continued to pay for their policies, indicating they want to continue to pay, even in the light of premiums, increasing premiums, they got virtually nothing from the settlement. There was no analysis of whether that 97% of the policyholders who continued to pay received anything. The principal benefit here is a non-forfeiture benefit. It's modeled on the National Association of Insurance Commission's model rules. Most states today have adopted that non-forfeiture benefit. So policyholders get that benefit automatically now. Plaintiff's counsel did provide a 10% increase in that benefit, but for the most part, most policyholders would get that benefit by state law now. So there's no analysis of that but a district court. There is very, because there were so many issues raised by the letter objections, by the objectors, substantive objections, we believe that any one of those objections may have been enough to cause the district court to give it some pause, to at least bring some independent depth and analysis to this very complex settlement. So what would you have us do? We have a debate of everything. You would have us reverse and remand with instructions to do what? I would say take a look at the arguments that were made. Not take a look, but write it in sufficiently extensive prose that makes sufficient These objections don't make sense and here's why. Or these objections make some sense, but in light of the benefits, we don't think that they're sufficient to overturn the settlement. I mean, typically when you have a lot of objections, I've seen many, many district courts. Do you think that there was a significant risk of losing this case from the plaintiff's point of view? I think that every case has significant risk. But this one particularly? Well, you had a certified class in California and I know that McHenry is a very able lawyer and at trial I think I think that there are two important circuit cases. Is there any circuit opinion against this case? Isn't there a circuit out east that was a third circuit opinion and recently in Iowa, wasn't there an opinion from the eighth circuit dealing exactly with this particular problem? There is some case law, but I think there are some wrinkles here. We've gotten some documentation. But you admit there is some case law that's against the plaintiff's. Substantial case law. There is always case law against the plaintiff, Your Honor. No, no. Substantial. So two important circuit cases. Your Honor, yes, there is case law that is factually intensive. Now, did you weigh that in your judgment when you analyzed the objections and thought that this was something that should not have been approved? Absolutely, Your Honor. Now, what about the attorney's fees? What do you think about those? I think the only cash provided by a corporate defendant when it goes to the attorneys and the plaintiffs in a case, I think that the court has an obligation to take a special look at what's going on. Well, let's assume that. But I'm asking you about the amount of the attorney's fees. Mr. Cannery is a fine lawyer. I'm sure he worked very hard on the case. But I think that the court had some obligation to look at what was going on. Now, I asked you. I asked you again, is the amount OK? Based upon what I know about the work that went into the case, I would not have a problem with the fact that there was an attorney's fee agreed to here. However, again, I think it needs to be balanced against the benefits that were given to the class members here. In light of that balance, I think that there's a substantial disconnect between the cash that went to the attorneys and the benefits that went to the class. Thank you. Thank you very much. We'll give you a couple of minutes for rebuttal. Thank you, Your Honor. Thank you. Good morning, Your Honors. May it please this court. My name is Alan Canner. I'm pleased to represent Ralph Schaefer, who's in the courtroom here today, as he was at most of the hearings in the district court, Sue Suveroff and Carl Loeb on this appeal. Judge Gutierrez should be affirmed. The case law in the Ninth Circuit is very clear. An objector has to make a strong showing of an abuse of discretion by the district court judge, especially whereas here, the district court judge basically pre-tried the case. We had a pre-trial conference and was ready for trial. This judge has intimate familiarity with all aspects of this case. Just so that we're clear, the actuarial data for the price increase in California was national data. We took national discovery. And so, when we approached the settlement, we had all of the information. We also, the record below established, we had gone to 17 different states to get their records. We had taken over 17 depositions, reviewed 220,000 documents. The trial judge had required us to give statements for each witness at trial. And we were budgeting who would say what, when, and how long we would go. This is a judge who is more familiar with this case than any I've ever seen. Hanlon, you affirmed a national settlement there, in a very good opinion. But Hanlon, the work that had been done prior to the settlement was much, much less than what we see in this record. So, counsel is left proving one of two things, just to make a strong showing. And you know and I know the way attorneys prove their cases with evidence. For example, he talks about the valuation of the benefits. The benefit package that we put together for this class was custom-tailored to the desires of our class. These are people who wanted long-term care. These are people, 97% of whom, who retained their policies even after the initial rate increase. So, what we did was try to give them more benefits along the lines that they liked. Now, the only truth in the record is the affidavit of Mr. Wilkins. The judge specifically requested a preliminary approval hearing and a declaration of counsel, myself, talking about what we had done in confirmatory discovery. What we found is that, and this is, we said it was worth $60 million, and as a practical matter, over 44% of the class voted for those benefits. It was a tremendous, tremendous turnout. Counsel talks about 123 people objecting. I think you're going to see some objectors in virtually every case. I think you can take that as a given. I think there's a Ninth Circuit opinion that says you can almost stipulate that there will be an objector or two in every case. The question is, did they come up with any evidence? Now, counsel is a lawyer. Did he look at Mr. Wilkins' affidavit and show the judge, here are some problems with it? Did he come in with his own expert? Did he create an evidentiary issue that might have required more analysis of the district court judge? We have a case here where the judge did enter, you know, findings of fact that only went about five pages. He did not rubber stamp, by the way. He specifically sent it back on the release issue and changed it. That statement is wrong. It is also wrong to say that on an old policy, it is required that you have a contingent non-forfeiture benefit. That is not the law. These are policies that were priced in 1995, sold through 1999. The requirements only apply to newer long-term care policies. Counsel was wrong when he said that it's automatically required of these policies that are subject to this class action. In the future, if you were to buy a policy tomorrow, it would have it built in, but the insurance company would be entitled to price in addition for it in order to cover that. Here, basically, the insurance company is eating it, and that's where Mr. Wilkins, an actuary, came up with this pricing. And really, there was no evidence the contrary offered at all at the hearing, which is surprising. And so I think the level of work you expect of a district court judge is probably related to the level of dispute, record dispute, all right? The judge said at the final approval, well, let's go back. At the preliminary approval hearing, he said, I want to see something on valuation. I want to talk about going from state to national class. I want to look at your fees. I want to see your time sheets, not, you know, a lawyer affidavit saying this is my total time. I want to see your time sheets, all of which was submitted to the court. At the final approval hearing, it was really, it was a great hearing, because what the judge said was, you know, I've read all these objections. You know, this is a, and I've looked at the response to the class notice. This is a tremendously well-educated demographic group of people we have here. They understand what's going on. I get the objections. I don't think that any of them have any merit, and none of them tried to raise any substantive point or try to put anything into evidence, which you would have expected from lawyers. So there's no strong showing that it's not fair, reasonable, adequate. There's no strong showing that the attorney fee award is unreasonable. I think counsel conceded that it was reasonable. It was based on both a load star and a percentage approach, 8% of the $60 million value, which was an actuarial number. But what that means is that CNA, who agreed to give the benefits. Mr. Kanner. Yes. Wilkins did the analysis which came up with the $60 million value. Yes. Was there an affidavit by an opposing expert actuarian from the objectors saying it's not worth $60 million, it's not worth anything? No, there was not. There was no record evidence at all submitted by any objector, including these objectors. So what Judge Gutierrez had before him was a record showing Wilkins, actuarial, evaluation of $60 million, and nothing else. That is correct, plus the declaration of counsel discussing confirmatory discovery. The notice to class members used that number of $60 million. I thought it was lower than that. It was lower than that. At the preliminary approval hearing and in the notice, it talked about $24 to $32 million. $23 or something. The difference primarily is that by the final approval hearing, we actually had the election of benefits concretely before us. At preliminary approval, we were speculating as to what people would pick. And there were a few surprises in there. The highest number of people took the enhanced contingent law and forfeiture benefit. But the notice said less value. It turned out it was more based on how people chose. And I think we disclosed to the District Court of Preliminary Approval Hearing that that number could, in fact, move. There's no evidence of fraud, collusion, or overreaching. This case, oh, and one last point on the actuarial data from Wilkins. At the pretrial conference, the trial court mentioned that he himself had experienced opposing actuaries. He had reviewed all the actuarial proof in the case and seemed very comfortable with that kind of data and information. There's no evidence of fraud, collusion, or overreaching. The only argument is, well, you had a bad theory. Now, here's what bothers me a little bit about that argument. Well, it bothers me a lot, I guess. We had expert reports in the record. Counsel didn't request those. Counsel didn't look at them. They had actually been filed because everything was filed right before trial and the motion's in limine. I mean, he says you had a disabled theory, but does he talk about what Professor Mark Brown, a Wharton PhD and chairman of the Wisconsin Insurance Department, had to say? No. We didn't have a disabled theory, and he could look at our expert reports. Judge Gutierrez had looked at it at the pretrial conference. It was resubmitted in the record. He didn't look at our cross-examination of their expert. What theory did he claim you should have used? Their expert did state the price difference. It was underpriced, and Mark Brown looked at the loss of chance issue. In other words, at the point in time when you had bought the policy, you could have gotten perhaps a better policy. He also looked at a disgorgement theory as well, and I thought he held up pretty well in the cross-examination. But the point is, the objectors never showed up and said, Judge, here are the flaws. They say it's a flawed theory, but it's a point in fact, and as Judge Gutierrez said at the final approval hearing, well, Mr. Kenner, you won. You got your class certified. His case was dismissed. So maybe there was some credibility issues that were in there as well. I believe, by the way, that there is no standing for Mrs. Landau. She had her day in court. She lost. She's a Pennsylvania resident, but she brought the action under the Illinois statutes. Correct. And the court said that there would be extraterritorial effect if they were to give her relief. The wording of the opinion specifically refers to no right of action and dismissal with prejudice, so I think she's out. But is that an adjudication on the merits? I believe it is an adjudication on the merits. I don't think she could file another lawsuit, because anything she raised or could have raised would have been barred is my belief. But I defer to you on that one. Couldn't she go to Pennsylvania and sue there? I don't believe so. I suspect the defendants. I don't believe so, no. She couldn't come to California and sue? I don't believe so, no. I think in California she would have gotten the same result as in Illinois. She was dismissed once without prejudice and refiled in Illinois, and the opinions were published, and we cite those. So I don't believe she has standing. This is a difficult area, Rees-Judicot. Would you agree with that? I do agree with that. And that some of us resort to the restatement to understand what we're reading. Would you agree that under the restatement principles that there has to be an adjudication on the merits for Rees-Judicot to apply? For um... Forget about these different cases now for just a moment. I don't know the answer to that question. As you can see from our briefs, we spent most of our time explaining why the district court should be affirmed. We didn't spend a lot of time on these other issues. We want this case affirmed quickly. I mean, in the year and a half... Enough, and I'm sorry I took up your time. No, no, no. No, I raised it. I invited it. You know, in the year and a half since Judge Gutierrez says, we're going to approve this settlement and people can get the benefits, and so many people, so many people, 47,000 people asked for the benefits. It's been about a year, a year and a half. Some of those people have paid two different cycles of premiums. That's about $4,500 a year. That's $9,000. We've gotten lots of calls while people are waiting. I would beseech you not to remand. I believe this record is self-evident. I think Judge Gutierrez did an excellent job. He ruled on two summary judgment motions, didn't he? I think there were three summary judgment motions. The class certification was twice. What? Did he write opinions when he wrote those? He did write short opinions on those. He indicated the day we announced the settlement, and this is on the record and it's in the appeal, he announced that he had reached decisions on a statute of limitations defense that was being raised by the defendants, and he had another motion to decertify. And so it was under the threat of those rulings that helped, because nobody knew which way it was going to go, that helped drive the settlement. And frankly, I don't blame CNA for wanting a broad release. The Ninth Circuit recognizes that's what it takes to get cases settled, and here in the Ninth Circuit we have a strong public policy favoring the settlement of complex cases. We did a great thing here. We've got these people additional benefits, and the timing couldn't have been better, because right thereafter, Alvarez in the Third Circuit, Rakes in the Eighth Circuit, I'm not saying were the kiss of death, but certainly would have gotten people no benefits at all. If timing is everything, this is a case that proves that. And that's why we think it should be affirmed, it should be affirmed promptly. I know there are a lot of demands on the court. We sat here today and seen your docket. I wanted to reserve some time for Ms. Simmons from CNA. You've got a minute and 26 seconds. Thank you. I'm sorry. You don't have to use it all. I may not, actually. Good morning, Your Honor. Lisa Simmons on behalf of Continental Casualty Company and CNA Financial Corp. And I really just wanted to stand up, and I thought I'd be remiss if I didn't make a couple of statements on behalf of my client, CNA, in this case, some of which have already been made both by you in the context of your questions and also by class counsel. This was a case where the class counsel came to the bargaining table knowing full well that they were going to have formidable defenses to overcome if they were going to prevail at trial. And most importantly, the big, black, bold letters on the front page of the policy, which told every policyholder when they got their policy, the premium rates can be increased, and you have 30 days to look at this policy and return it if you are not satisfied with its terms. There was no evidence that CNA had ever- Why didn't you put that in the promotional material, too? You know, I suspect that it was in the promotional material. I don't recall that detail on the top of my head, but this is a very common fact with these types of guaranteed cost, guaranteed renewable policies. The premiums can be increased. However, you automatically have a right to renew once you pass initial underwriting at the beginning, but you have to pay the premiums. And the letters that the class members sent to the court, we actually quoted a number of them in footnote 2 of our brief, showed that the class members understood that their premium rates could be increased. So the Third Circuit, you know, affirmed dismissal of a virtually identical claim- Is it identical, do you think? Virtually identical complaint on the very basis of the policy form language. How about the Eighth Circuit? The Eighth Circuit was almost an identical complaint as well, and the Seventh Circuit has also affirmed dismissal of a similar case, the Crichton case. We cited the district court opinion. That's now been affirmed by the Seventh Circuit, and that was a slightly different theory in the case, but basically it was a failure to dismiss. Shouldn't have settled, huh? Yeah, right, right, right. It was just too soon. But the evidence, even if the final pending motions had gone against us, the evidence at trial would have showed that CNA did nothing intentionally or negligently to underprice these policies to lure people in. They based their pricing on the data that they had available at that time, and in retrospect, the data didn't turn out exactly as they expected. That's because people wanted the policies. People wanted to keep their policies. The lapse rates were not consistent with what they had expected based on prior experience. I mean, it would never have made financial sense for CNA to underprice these policies, hoping someday they'd be able to recoup those losses through an increased premium rate because they can't just raise premiums on their own. They have to go to the Departments of Insurance and get approval. So it just would not have made financial sense. I think we're hearing your final argument. Yeah, right. The second point I wanted to make is just that the notice was very extensive, and it was extraordinarily successful in this case. I haven't seen, you know, the notice. We identified the class members specifically, so every class member got a personal notice. Based on remailings, we know it got to 99.9% of the class members, and, like, 46% returned the benefit form, which is amazing given that there was a default option. They could have gotten the default option, which turned out to be the most popular option, benefit in the settlement, even without returning a benefit form. But 46% of the people who received it actually returned the benefit form, even though they didn't necessarily need to to get the benefits. And this applied across the board, whether they had received a premium rate increase already or had not received a premium rate increase already. I see you're over your time. Thank you very much. Thank you. Mr. Fisher, rebuttal. Thank you, Your Honor. Just a couple of points. As it turns out, I think the appellees put into the record some of this selling literature at supplemental excerpts of record beginning at page 505 through 536, and I defy you to find anything about premiums could be increased in there. In fact, all their charts, all their illustrations illustrate fixed premiums over the life of the policy, totally at odds with what the policy said. And we all know the policies are mailed out well after you actually sign up and send your checks in. It's all very nice that the non-adversarial settling parties believe this to be a good settlement here, and they believe the defects in the settlement highlighted before the district court are at best mere fly specks and are not worthy of comment. However, again, it is not the settling party's view. It is the district court which is charged with protecting absent class members. It is the district court's important role here in this process to bring its own independent judgment and analysis to determine whether the highlighted defects are of sufficient character to reject the proposed settlement. Here, in the absence of any opinion or any findings independent of what the party submitted to the court, that independent analysis does not exist. The district court, we believe, failed in its responsibility to oversee this class action. Thank you, Your Honor. Thank you very much, Mr. Fisher. And thank you, Mr. Kanner, both of you, for a very interesting presentation and an interesting case. Thank you, Your Honor.
judges: Hart, Gould, Bea